## KIPROS v. UINTAH RY. CO.

No. 2641.   Decided January 19, 1915 (146 Pac. 292).

1. APPEAL AND ERROR—HARMLESS ERROR—ERRONEOUS ADMISSION OF EVIDENCE. Where, in an action for negligent death for the benefit of decedent's wife, residing in a foreign country, two witnesses having knowledge of the facts testified to the marriage in the foreign country, error, if any, in admitting in evidence an alleged certified copy of the marriage, was harmless. (Page 396.)

2. MASTER AND SERVANT—INJURY TO SERVANT—ACTIONS—EVIDENCE —ADMISSIBILITY. Where, in an action for the death of a railroad employé by the collapse of a railroad bridge undermined by an extraordinary freshet, the complaint alleged negligence in the construction of the bridge and in the failure of examining it before running a train over it in violation of a rule of the company, testimony of witnesses having some qualifications to testify on the subject as to the custom or rules of other railroad companies in inspecting bridges in cases of extraordinary freshets before running trains over them, in response to questions not calling for their conclusion, was properly received in evidence as against the objection that no custom or general rule was pleaded. (Page 398.)

3. APPEAL AND ERROR—CROSS-EXAMINATION—DISCRETION OF COURT. A liberal rule prevails as to cross-examination, and cases are rarely reversed because of matters elicited on cross-examination which strictly are not such. (Page 403.)

4. MASTER AND SERVANT—EVIDENCE—ADMISSIBILITY. Custom or general rule of others engaged in the same business and under similar conditions are pertinent only to aid the jury in determining what reasonable care was required or ought to have been taken in the given case, and whether the charged acts of commission or omission constituted such care or amounted to negligence. (Page 404.)

5. MASTER AND SERVANT—INJURY TO SERVANT—NEGLIGENCE—EVIDENCE. Whether ordinary care of the operators of a train required the stopping of the train and the examination of a railroad bridge because of an extraordinary freshet before running the train over it depends on the physical conditions, the severity of the storm, the amount of rain that had fallen, the quantity of water passing under the bridge, its effect on it, but custom or general rule of other railroads is immaterial. (Page 404.)

6. APPEAL AND ERROR—QUESTIONS REVIEWABLE—OBJECTIONS TO EVIDENCE. A party making one objection to evidence may not on appeal complain of its admission on other grounds. (Page 405.)

7. APPEAL AND ERROR—HARMLESS ERROR—ERRONEOUS ADMISSION OF EVIDENCE. Where, in an action for the death of a railroad employé while riding on an engine passing over a bridge which fell because undermined by an extraordinary rainfall, recovery was sought on the theory of negligent failure to stop the train and examine the bridge before attempting to run over it, the error in permitting a witness to testify that, if he was in charge of running the train, he would use his own judgment whether to stop and examine bridges before passing over them, and would do what he thought reasonable care demanded, whether provided by rule of the company or not, and that it was customary to be careful and examine, and that there was a rule as to inspection of bridges, was harmless. (Page 406.)

8. WITNESSES—CROSS-EXAMINATION. Where a witness on direct examination testified to the giving of verbal instructions to train crews to let no one ride on engines other than employés in the discharge of their duties, and on cross-examination admitted that there were extreme cases of emergency when other employes were permitted to ride on engines, and on redirect examination stated that the extreme cases of emer-

gency spoken of were when there were no cars for the other employés, a question on recross-examination as to whether there was an emergency at the time involved was not objectionable as not proper cross-examination. (Page 406.)

9. MASTER AND SERVANT—INSTRUCTIONS—EVIDENCE. Where, in an action for the death of a railroad employé while riding on an engine passing over a bridge which collapsed because undermined by an extraordinary rainfall, the engineer testified that he had received orders from the superintendent not to allow any one to ride on the ·engine except members of the train crew, of which the employé was not one, and had ordered him not to ride thereon, and the superintendent testified that he had given verbal instructions to members of train crews not to allow any one to ride on engines other than employés in the discharge of their duty, and the court charged that if decedent was told by the engineer not to ride on the engine, but, in disregard of the command, he rode on the engine, there could be no recovery, refusal to charge that if there was a custom that no one outside of the train crew could ride on engines, and that decedent knowingly violated the custom, there could be no recovery, was not erroneous. (Page 407.)

10. DEATH—DAMAGES—MISLEADING INSTRUCTIONS. An instruction in an action for negligent death that in assessing damages for the benefit of decedent's widow the jury are not to consider any grief or mental suffering or loss of the husband's society, companionship, or affection, but may consider the age of decedent at the time of his death, his occupation, the wages he was receiving, the support which he furnished his wife, the condition of his health, his probable earnings during his probable duration of life, and, in connection with the evidence on the probable pecuniary loss, fix such damages as "shall be fair and just," and that the damages must be strictly limited to the financial loss sustained, was not misleading because of the use of the quoted words as leading the jury to believe that they could find any amount within the amount demanded which they thought was just and fair. (Page 408.)

11. TRIAL—INSTRUCTIONS—ASSUMPTION OF FACTS. An instruction, in an action for the death of a railroad employé while riding on an engine passing over a bridge which collapsed because undermined by an extraordinary freshet, that if the bridge was insufficient to withstand the force of the waters, or if the bridge was not protected by cribbing, so as to prevent the water from undermining the supports of the bridge, and if the railroad company knew that the bridge was dangerous for the train on which decedent was riding to pass over it, and

that the company permitted the train to move on the bridge, and if the train was wrecked and decedent killed, and his death resulted because of the defect or insufficiency of the bridge and its support, the company was negligent and liable, unless decedent assumed the risk, was not objectionable as assuming that the company was negligent in failing to protect the bridge with cribbing. (Page 409.)

Appeal from District Court, Fourth District; *Hon. A. B. Morgan,* Judge.

Action by George N. Kipros, administrator of the estate of Christ M. Kipros, deceased, against the Uintah Railway Company.

Judgment for plaintiff. Defendant appeals.

AFFIRMED.

*Van Cott, Allison & Riter,* for appellant.

*Weber & Olson* for respondent.

STRAUP, C. J.

This action is brought to recover damages for the death of plaintiff's intestate, alleged to have been caused by the negligence of the defendant, an interstate common carrier of passengers and freight for hire from Dragon, Utah, to Mack, Colo. The deceased was in its employ, and, admittedly, at the time of his death, was engaged in interstate commerce within the meaning of the Federal Employers' Liability Act. The case was tried to the court and a jury. The plaintiff had judgment in the sum of $3,467, from which the defendant appeals.

The questions presented for review relate to the admission of certain evidence over the defendant's objections, to portions of the charge, and to the court's refusal to charge as requested by the defendant. The pleadings are voluminous. Only so much of them, and of the evidence, will here be noticed as thought necessary to illustrate the assignments.

In the complaint it is alleged that the defendant, a few miles west of Mack, maintained a railroad bridge across a ravine about one hundred twenty feet wide and about ten feet

deep.  The ravine, as is alleged, was a common channel for sur-
face waters of the surrounding country and for various smaller
ravines and channels tributary thereto, and that during heavy
rainstorms and cloud-bursts large quantities of water coursed
down the ravine, and, on the occasion in question, washed away
the east bank of the ravine, rendering the bridge dangerous
and insecure.  It is further alleged that the defendant negli-
gently maintained a weak and insufficient and dangerous
wooden bridge, and one insufficient to withstand the force of
the waters as they coursed down the ravine; that the bridge
was insecurely constructed and maintained with charred and
burned pilings and stringers; that the east bank of the ravine
was unprotected with cribbing or other bulwarks, permitting
the bank of the ravine and the earth about the piling of the
bridge to be washed away.  It further is alleged that for
about ten hours prior to the accident large quantities of
water, resulting from a heavy rainstorm and cloud-burst,
coursed down the ravine, and so undermined and weakened
the bridge as to render it dangerous and unsafe to operate
cars over it, and at other places to the west thereof washed out
other smaller bridges and culverts, and portions of the defend-
ant's track; that the defendant, notwithstanding it had knowl-
edge and notice of all this, attempted to operate a train of
cars, upon which the deceased was carried, over the bridge,
which gave way, causing the engine to be precipitated to the
bottom of the ravine, killing the deceased.  It also is particu-
larly alleged that, under all the circumstances, it was the duty
of the defendant, before attempting to operate cars over the
bridge, to examine and inspect it to ascertain its condition,
but that the defendant, although it had on that occasion
stopped its train and sent men forward to inspect and examine
other bridges as they were approached before attempting to
cross them, nevertheless, when it approached the bridge in
question, negligently failed to stop, or to examine the bridge,
and attempted to cross it without stopping, and without in-
spection or examination.  It further is alleged that the de-
fendant had adopted a rule of the Denver & Rio Grande Rail-
road system, which is:

"In case of extraordinary rainstorms or high water, train

must be brought to a stop and a man sent out and examine bridges, trestles, culverts, or other points liable to damage before passing over it. Conductors and engineers will make careful inquiry at all stopping places, and when thought advisable make extra stops to ascertain extent and severity of storm, taking no risks'' and that the defendant, on the occasion in question, negligently failed to enforce or observe that rule. It further was alleged that the sole surviving heir of the deceased was Vassiliki Kipros, his widow.

The defendant, in its answer, admitted the ravine was a common channel for surface waters from the surrounding country; that it maintained a wooden bridge across it; that the east bank of the ravine was not protected by cribbing, but alleged that that was unnecessary; that a heavy rainstorm had fallen, for some hours before the accident; that the defendant's track in one or two places had been undermined; that the bridge at the ravine had become partially undermined at the east end, but such undermining was invisible because of the presence of the water, and that, as a result thereof, the engine plunged into the ravine, causing the death of the deceased, who was riding on the engine. It denied the alleged negligence, and pleaded contributory negligence and assumption of risk, in that the deceased, without authority, and without the defendant's knowledge, rode on the engine.

The plaintiff, in brief, adduced evidence to show that the defendant, on the evening of the day of the accident, was operating towards Mack a mixed passenger and freight train consisting of an engine and tender, a box car loaded with ice, a passenger car containing three or four passengers, a freight caboose, and a flat car, in the order named. On account of a heavy and unusual thunder and rain storm and cloud-burst that afternoon, a bridge or culvert about eight miles west of Mack was washed out, preventing the train passing over it. The train arrived at that place between six and seven o'clock in the evening. The train crew communicated with Mack to the east and Atchee to the west for help. The deceased, at Mack, was employed and engaged in transferring gilsonite for the defendant. The foreman, at Mack, with a gang of men, including the deceased, took a push car loaded with ties and

other material, and proceeded to the place of the washout, reaching it at about nine o'clock p. m. The foreman, with this gang, passed over the bridge in question. There then were large quantities of water coursing down the ravine under the bridge. About the same time a gang of men arrived from Atchee. The night was dark. It continued raining most of the time. It took about two or two and one-half hours to repair the washout, when the train proceeded on its journey towards Mack. The conductor and the foreman, with lanterns, rode the pilot of the engine and kept a lookout for bad places along the track. The repairmen, thirty-five or thirty-eight of them, as the train started, boarded, some of them the steps of the passenger coach and the caboose, others the flat car. The caboose was locked, to prevent them going in there and getting the floor of the caboose muddy. As the train proceeded and approached bridges and culverts, it was stopped; the conductor and the foreman going forward and examining the structures before attempting to pass over them. Several bad places and washouts were found before reaching the bridge in question. They were repaired, and the train then slowly proceeded forward. The last stop made was about a mile west of the big bridge, the place of the accident. When the train proceeded from the last stop the conductor and foreman no longer rode the pilot, but boarded the steps or the platform of the passenger coach. When the big bridge was reached no stop was made, and no inspection or examination made of it, nor anything whatever done to ascertain its condition, before attempting to cross it. At that time the east bank of the ravine, by the waters coursing down it, as some of the witnesses testified, the full width of the ravine and to a depth of about ten feet or more, had been washed away, the bridge undermined at the east end for a distance of about thirty-five or fifty feet, and rendered so insecure as not to support cars operated over it. As the train thus slowly proceeded on the bridge, the engine and tender, as the washout was reached, plunged into the ravine below, killing the fireman and the deceased, who was riding on the engine on the fireman's side. That was about one o'clock. The engine and tender were entirely submerged by the water coursing over them. The

engineer was rescued that night. The bodies of the deceased and the fireman were not found until a day or two thereafter. Even at that time there was sufficient water coursing down the ravine to cover the engine lying on its side.

The engineer testified for the defendant that he, before the engine started on its journey after the repairs had been made, saw the deceased and others at the engine, as he supposed, to get a drink of water, and that he then frobade the deceased to ride on the engine, and did not know he was on it. The plaintiff adduced evidence to show that the fireman and the deceased were well acquainted and friendly, and that when the last stop was made the deceased was seen on the engine "chatting" with the fireman in the presence of the engineer, and that the fireman, in the engineer's presence and hearing, invited others to ride on the engine "to warm and dry themselves."

The first assignment relates to this: Under the defendant's denial "of all the allegations in the complaint not hereinbefore specifically admitted," the averment in the complaint that Vassiliki Kipros was the wife of the deceased was put in issue. She resided in Greece. The plaintiff took her deposition. She deposed that she was the wife of the deceased, when and where they were married, where they had lived together as husband and wife, his going to America and the moneys regularly sent her by him each month, and further deposed: "I attach documentary evidence, Exhibit 1, of my marriage to this deposition." The exhibit purports to be a certified copy in the Greek language of a record in Greece showing the marriage between the deceased and the deponent. The plaintiff caused a translation to be made of it from the Greek to the English language. The translation is:

"I certify as archbishop of Kranedion that it appears on the book of the Permission of Marriages of the County of Kranedion that Christos Michael Kipros, aged 32, came in lawful marriage to Vassiliki Panagiotou Toumpe, aged 24, on September 7, 1908. The marriage was performed by the reverend of the Holy Church Prodromou, Michael Louka."

This was signed by Panteles N. Economos, archbishop of Kranedion. His signature is certified to by the mayor of

Kranedion; the mayor's by the governor of Argolidos and Korintheas; the governor's by the minister of the interior; and the minister of the interior's by the minister of foreign affairs; and the minister of foreign affairs' by the deputy counsel general of the United States. To the certificate is attached what purports to be the Greek public seal, and other seals and fee stamps. The exhibit was offered in evidence in connection with, and as a part of, the deposition. It was objected to by the defendant on various grounds; chiefly, that the instrument was not shown to be "a public record nor a copy of a public record," and was not shown to be certified to "by the officer having the legal custody of the original." The plaintiff then called a witness who testified that he was born in Greece, had lived near Kranedion, was himself married in Greece, and there reared a large family. He then was asked:

"What department or public office in Greece has charge of the subject of matrimony and control of marriages and permission of marriages, if you know?"

To that the defendant objected upon the ground that it was not shown that the witness "has any competency to speak on that subject." The court overruled the objection. The witness answered:

"The high priest and archbishop. He has charge of the permissions of marriages and of the records, the preacher—the reverend—performs marriages in Greece. I know whether permissions for marriages are obtained in Greece from any official."

A motion was also made to strike the answer. That was overruled. The witness further testified that he knew the deceased when he lived in Greece, and that:

"I know the time he was married. I was there. After that he lived with Vassiliki Christou Kipros as his wife. They went out in public and lived together as man and wife. They were going out. They were going to the church and public parks."

He further testified that he had had an invitation to the marriage, but "I was not present at the marriage ceremony." The plaintiff thereupon again offered the exhibit in evidence. The offer was objected to upon the same grounds. It then

was admitted. Complaint is made of these rulings. It here is urged, as it was below, that the person certifying to the record did not certify to a copy of any record, but certified that "it appears in the book of the Permission of Marriages," etc., that the deceased and Vassiliki Kipros were married, and that the witness who testified that the archbishop had charge of the permission of marriages and of the records had not shown sufficient qualification to testify to that. We think the matter of little moment. The plaintiff adduced good and sufficient evidence, independently of the exhibit, to show that the deceased and Vassiliki Kipros were married, lived together as husband and wife, and that she, at the time of his death, was his wife. That was shown by the testimony of at least two witnesses who had knowledge of the fact. That testimony was not disputed. The defendant offered no evidence whatever on the subject. It thus is of no consequence whether the exhibit was or was not properly admitted. With it in or out, a finding that Vassiliki Kipros was not the wife of the deceased at the time of his death would, on the record, be wholly without support and against good and indisputable evidence that she was his wife.

The plaintiff adduced testimony to show the physical conditions of the country surrounding the place in question and over which the defendant's road extended; the watersheds, gullies, ravines, gulches, and especially the ravine in question, and that it was the main channel for numerous ravines tributary thereto; its width and depth at the bridge; the character of the bridge, how constructed and maintained, and that some of the piling and stringers were charred and burned by a fire several years prior to the accident; that the west bank of the ravine was rocked and cribbed to prevent washings, and that the east was not, and was left unprotected; the extent and severity of the storm; the heavy and unusual rainfall; the quantity of water coursing down the ravines and gullies, and the effect it had on the ravine and bridge and track; the movement and operation of the train; the communications sent to Atchee and Mack for help; the washouts found and the repairs made; the lookout kept as the train proceeded to the last stop before the bridge in question was reached;

the effect the waters had upon the east bank of the ravine and the bridge; that when that bridge was reached no stop was made, and no examination made of it, and nothing done whatever to ascertain what effect, if any, the sudden excess of waters coursing down the ravine had upon it before attempting to cross it; and other facts and circumstances immediately preceding and surrounding the accident.

In addition to that, the plaintiff also put in evidence the deposition of a witness taken on behalf of the defendant. It was the deposition of the conductor who had brought the gang of men from Atchee to the place of the first washout, and who from there accompanied the train to the place of the accident. He, on direct examination, deposed concerning the bridge, its construction and condition, the ravine, the water coursing in it, the washouts and repairs made, the movements of the train, and the circumstances of the accident. On cross-examination he deposed that there was no cribbing at the east end of the bridge; that there was a heavy rainfall, and that water was flowing through all the ravines and gullies between Atchee and Mack, and that the storm was a little out of the ordinary; the time he had been in the defendant's train service; and that he had had "railroad experience elsewhere with the Louisville & Nashville about five years as brakeman and conductor, and with the Southern about three and one-half years as flagman." Then, on further cross examination he was asked:

"It is the custom and the ordinary duty, in case of an extraordinary rainstorm or high water, that the train should be brought to a stop and a man sent out to examine bridges, culverts, and other points liable to damage before passing over it, isn't it?"

To that an objection was made by the defendant upon the grounds of improper cross-examination, no competency of the witness shown to speak as to the customs inquired about, that the question called for the opinion and conclusions of the witness, and that it was not limited to the time of the accident. The objection was overruled. The witness answered:

"Well, we didn't have any, as I said, in the book of rules. Q. I say, isn't that the ordinary rule and duty on all railroads, whether it is in the book of rules or not?"

To that the same objection was made, and further, that "the rules themselves are the best evidence." The objection was overruled. The witness answered:

"If I was in charge of the running of the train I would use my own judgment, if I thought it necessary; I would do that if I thought it necessary; and I would do that if I thought reasonable care demanded it. Q. And that would be required ordinarily of railroad operatives, wouldn't it?"

This was objected to upon the same grounds. The objection was overruled. The witness answered:

"Well, it is all right whether it is provided for by rule or not. I would, if I thought it was necessary that I do it, go and make a personal examination."

The plaintiff also called the defendant's superintendent. He testified that he had been in the railroad business for twenty-five years as brakeman, conductor, and superintendent, and had worked for the Denver & Rio Grande Railroad Company from 1889 until 1903, and that he had also been in the employ of the Rio Grande Western, and of the Uintah Railway Company. He testified that the defendant had no printed rules governing the movement of trains at times of high water, and had not adopted the rules and regulations of the Denver & Rio Grande Railroad Company nor of any other railroad company—"but we gave verbal instructions governing the movement of the trains. We had special instructions regarding the movement of trains over our tracks of extraordinary high water or rainstorm; we had bulletins up. We issued special instructions from time to time. I know on this occasion the dispatcher told the conductor to be very careful and to look out for trouble after this first accident was reported—the washed out culvert. We also sent our foreman out from Mack to examine the track and help. That is the only instruction or rule I know of."

Then he was asked by plaintiff's counsel:

"Q. Then, you didn't have a rule, printed or verbal, which in substance or effect was that in cases of extraordi-

nary rainstorm or high water a train must be brought to a stop and a man sent out to examine bridges, trestles, culverts, and other points liable to damage before passing over it, did you?"

To that defendant's counsel said:

"I object to that as incompetent under the pleadings. There is no charge of negligence in the complaint in failing to adopt any rules. The charge is that we did adopt the Denver & Rio Grande rules, and that this was a violation of them."

The objection was overruled. The witness answered: "No, sir." The witness was then further asked concerning his experience and work with other roads heretofore mentioned, and then was asked:

"Q. I will ask you if it is not the custom in your experience as a conductor on other railroads where you have worked, under the same circumstances which you have mentioned as obtaining between the Uintah Railway Company and the other road that you worked on, in case of extraordinary rainstorm or high water, that a train must be brought to a stop and a man sent out to examine bridges, trestles, culverts, and other points liable to damage before passing over the same?"

To that an objection was made upon the grounds that the witness was not shown to have had sufficient experience to qualify him to answer; that his experience was too remote; and that the inquiry was not confined to the time of the accident. The objection was overruled. The witness answered:

"Why, it was customary to be very careful and examine; that was the custom; yes."

The plaintiff also called the general foreman of the construction of the Denver & Rio Grande Railroad Company, with headquarters at Tucker, Utah. He testified he had been in the service of the Denver & Rio Grande Western Railroad Company, the Rock Island, and the Union Pacific, in various capacities, principally as foreman of bridge gangs and scale inspector. He was asked:

"During your experience in the railroad service for those roads, I will ask you if it was the custom that supervisors

of bridges and buildings, or any persons having supervision over road carpenters, masons, pumpmen, or other like employes, must know that labor and materials are used properly and economically, that the bridges and structures are being maintained in a safe condition, make periodical inspections, and know that foremen understand the rules and signals?"

To that an objection was made that it was not shown that the witness had competency to speak of such a custom on the several roads on which he had worked, and that the question was incompetent under the pleadings, and that it was not alleged in the complaint that there was any custom or usage on the part of other railroads such as was inquired about. The objection was overruled. The witness answered: "I understand that there was such a rule. Q. Was that the custom?" To that the same objection was made, which was overruled, and the witness answered: "I so understand it." The witness was then cross examined with respect to inspections, and by whom made, from which it was elicited that it was the duty of inspectors to look bridges over and determine whether, in their judgment, they were safe, and that inspections were not made at stated intervals, but when ordered by the supervisor, who designated the bridge to be inspected. Then on redirect he was asked:

"But it was the duty of the supervisor to see that the bridges and structures were being maintained in a safe condition?"

To that an objection was made as calling for the conclusion of the witness. It was overruled. The witness answered:

"I would naturally presume so, but I am not exactly familiar with the routine of the supervisor's office. As general foreman of construction I got my orders from the construction engineer on the works. It is my understanding that it was the custom that he should see that the bridge and structures were maintained in a safe condition, and to make periodical inspection of the bridges and buildings."

Complaint is made of all these rulings. The plaintiff seemed to have labored under the impression that to show a duty was imposed on the defendant and the train operatives in charge of the train to examine the bridge, under all the

circumstances, before attempting to cross it, it was essential to show that the defendant had itself, by establishing or adopting some rule, cast such duty on itself. He, having alleged such a rule, but failing to prove it, evidently thought the day might be saved by proving such a custom or rule on other roads. And, unless he proved the one or the other, his cause was lost. From the character of the objections interposed it seems the defendant entertained the same view. No objection was made to plaintiff's attempt to prove the alleged rule. It was thought proper to prove that because it was alleged. But when the plaintiff offered to prove a custom or general rule on other roads, in case of an extraordinary rainstorm, to stop the train and examine bridges before passing over them, objections were interposed on grounds of improper cross examination, insufficient qualifications of the witness, that the inquiries called for a mere opinion or conclusion, and that no such custom or general rule was pleaded. We think the proffered testimony not vulnerable to such objections.

A liberal rule prevails as to cross examination. Causes rarely are reversed because of matters elicited on cross examination which strictly is not such. Some qualifications of the witnesses were shown. The inquiries did not **3** call for the mere opinion or conclusion of the witness. No such custom or general rule inquired about was pleaded. But, had such custom or general rule been relevant and material, it could have been shown without averments. The testimony, if vulnerable, was so, not because the custom or general rule was not pleaded, but because the testimony was irrelevant and immaterial; because the custom or general rule inquired about, pleaded, or not pleaded, was itself immaterial and irrelevant. From the objections it seems counsel thought that, had the custom or general rule been pleaded, had the witnesses shown sufficient qualifications, had the inquiries been proper cross examination (most of them were direct), and had the questions been so framed as not to call for the opinion or conclusion of the witness, the testimony would have been admissible. The matter lies deeper than that. The

objections go but to the bark, and not to the pith, of the matter.

There are instances where it is proper to show custom, usage, or a general rule of others engaged in the same business and under similar conditions. When proper to be shown, they are pertinent only to aid the jury in determining what reasonable or ordinary care was required, or ought to have been taken, in the given case, and whether the charged acts of commission or omission constituted such care, or amounted to negligence. The matter pertains to evidence, not pleading.

Here the question of whether the defendant, or its employés in charge of and operating the train, in the exercise of ordinary care, ought to have examined the bridge before attempting to pass over it, and whether they were negligent because that was not done, depended upon the facts and circumstances of the case, prominent of which are the character and condition of the ravine and bridge, the physical conditions of the surrounding country, the extent and severity of the storm, the amount of rain that had fallen, the quantity of water coursing down the ravines and gullies, the effect it naturally had, or might reasonably be expected to have, upon the track, culverts, and bridges, as well as other facts and circumstances of the case, from which it might reasonably be expected or anticipated the bridge was rendered unsafe. All this was shown. From that, if it was such as to permit and justify a finding of negligence (which is not disputed), the jury were required to determine whether or not due care, under all the circumstances, required an examination and inspection of the bridge before attempting to pass over it. Whether it was the custom or general rule of other roads, in case of extraordinary or unusual rainstorms, to do that or not, let it be conceded, was wholly immaterial and irrelevant, and had no tendency to prove the care in such respect that ought to have been taken in the given case. And then it is hard to conceive a similarity of cases as to this, where the conditions are the same, the physical condition of the country, the character of the ravine, the character and structure of the bridge, the extent and severity of the storm,

the amount of rainfall, the quantity of water, and the force with which it coursed down the ravine, etc. Thus let it be conceded that the custom or general rule of others inquired about had no pertinency, not because it was not pleaded, but because it, pleaded or not pleaded, had no relevancy or materiality in determining any of the pertinent issues of the case. Pleading it would have added nothing to its admissibility. As well say that, had the plaintiff averred that it was the custom or general rule on other roads to permit such employés as the deceased to ride on engines, or other roads not to lock the door of the caboose, the plaintiff would have been entitled to prove it because it was alleged. Though not pleaded, yet, had such proof been tendered, an objection to its admissibility on the ground that it was not pleaded would not be of substance, but rather a concession of its admissibility, had it been pleaded. And since such matter pertained to evidence, and not to pleading—that is, something the admissibility of which is not dependent upon special averments as to it—an objection to its admissibility because it is not pleaded amounts to nothing.

Depending upon the particular facts, due care in one case might well require a train to be stopped and bridges examined before attempting to pass over them; in another not. Whether due care required that to be done in the one, and not in the other, is not susceptible of elucidation by proof of a custom or general rule of others. Such proof has neither relevancy nor materiality to aid the jury in forming their judgment of what the defendant, or its employés in charge of the train, in the exercise of ordinary care, were or were not required to do in the given case.

But, since no such objection, nor any objection, reaching the kernel and going to the real substance of the matter—the thing vulnerable—was made, no relief can be given the defendant on these rulings; for it may well be presumed that, had proper specific objections been made, the rulings would have been different. It is enough to hold, as we do, that the rulings were not erroneous and prejudicial as against the objections which were made.

And then, many of the answers made were harmless. The first witness—who answered, "If I was in charge of the running of the train I would use my own judgment; if I thought it was necessary [stop and examine bridges before passing over them] I would do that; and I would do that if I thought reasonable care demanded it," and "whether it is provided by rule or not"—seemed to have the right idea of the matter in hand, as did the court, upon its charge to the jury. The answer which the superintendent made—"Why, it was customary to be very careful and examine; that was the custom"—is not of prejudicial effect. When all of the answers of the foreman of construction are considered, it is quite apparent that the particular answer made by him that, "I understand there was such a rule," or "custom," in response to the question respecting inspection of bridges, and that supervisors must know that "labor and materials are used economically," etc., had no harmful effect; at least not to the extent requiring a reversal. While there is neither sense nor pertinency to the question, yet to say that the answers made by the witness prejudiced the defendant is another thing. We do not think they did.

In support of its plea of contributory negligence, and of the deceased's assumption of risk, the defendant called the engineer who testified that he saw the deceased at the engine getting a drink, and that when he got ready to start, after the repairs had been made, he told the deceased "to get off the engine and stay off," and that the deceased said, "All right," and got off, and that the witness had no knowledge that the deceased afterwards got on the engine; that his instructions were not to permit any one to ride on the engine except members of the train crew and superior officers. The superintendent also testified that he had given verbal instructions to members of train crews to let no one ride on engines other than employés in the discharge of their duties, and that that included engineers, firemen, brakemen, conductors, superintendent, bridge builders, and the roadmaster. On cross-examination he testified:

"There are extreme cases of emergency when you can't very well avoid even Greeks riding on the engine, and in such cases they are permitted to ride."

On redirect examination he testified that the extreme cases of emergency spoken of were when they had no cars for them to ride on. Then on recross he was asked:

"Q. But I say there was an emergency on the railroad that night, an unusual occasion, wasn't there?"

To that an objection was made on the ground that it was not proper cross-examination. The objection was overruled. The witness answered: "Yes, sir." Complaint is made of this. In view of the previous testimony of the witness, we think it was not improper.

The defendant by its requests to charge requested this:

"If you find that there was a custom and rule in force on the defendant's railroad that no one outside of the train crew or those specifically authorized by the company's officers should ride on the engines of trains, and that the deceased, on the occasion in question, knowingly violated such custom and rule by riding on the engine, then I instruct you that in doing so he would be guilty of negligence, as a matter of law."

The court, refusing that, charged:

"If you find that Mr. Kipros was told by the engineer, or any other employé with authority in such matters, not to ride on the engine, but that, in disregard of such command, he rode on the engine, then I instruct you that your verdict should be for the defendant."

Complaint is made of the refusal to charge as requested.

There was no evidence to support a finding of facts stated in the request, "If you find that there was a custom and rule in force on the defendant's railroad," etc. What was testified to in such respect was:

By the engineer: "I received orders from the superintendent not to allow any one to ride on the engine except members of the train crew."

By the superintendent: "I gave verbal instructions to members of the train crew not to allow any one to ride on

the engines, other than employés in the discharge of their duty," etc.

The charge which the court gave was more applicable to the evidence than was the request, and hence no error was committed in refusing the request.

On the question of damages the defendant requested:

"(1)   If you find that the plaintiff is entitled to recover damages, then I instruct you that you can award damages only for the loss sustained by the widow (if you find that the deceased did, in fact, leave a widow) in being deprived, by the death of the deceased, of a reasonable expectancy of the pecuniary benefits she would have received from him but for his death. The damages are limited strictly to the financial loss thus sustained. You cannot award her damages for any grief or mental suffering because of his death, or for being deprived of his care, society, companionship, or affection."

Also, that "you will award no damages for any pain or suffering that the deceased may have suffered between the time of being precipitated into the wash and the time of his death," and that, if the jury found that the plaintiff was entitled to recover damages, then, in determining the amount, they had a right to take into consideration "the possibility of her remarrying and receiving from another husband the pecuniary benefits of which she may have been deprived by Mr. Kipros' death," and that in determining "the possibility of her remarriage you have the right to take into consideration her age and the fact that she had no children by Mr. Kipros." The court gave all that, but, instead of giving the first request in the language requested, gave this:

"The court instructs the jury that, if you find the issues in favor of the plaintiff, it will then be your duty to assess such damages as should be awarded to the plaintiff for the benefit of the widow of Christ M. Kipros, deceased, if you find he did leave a widow. In assessing such damage you are not to take into consideration any grief or mental suffering on the part of the widow because of his death, or her loss of his society, companionship, or affection, but you have a right to take into consideration the age of the deceased at the time

of his death, his occupation, the wages he was receiving, the support which he was furnishing to the widow, the condition of his health, his probable earnings during his probable duration of life, and from such considerations, in connection with the evidence before you throwing light upon the probable pecuniary loss which the widow has sustained in the death of her husband, it will be your duty to assess such damages as shall be fair and just, not exceeding the sum of $25,000. If you find any damages for the plaintiff, such damages must be strictly limited to the financial loss sustained by the widow of the deceased. You cannot award any damages for any pain or suffering that the deceased may have suffered between the time of being precipitated into the wash and the time of his death.''

All other requests on the subject were given in the language requested. Complaint is made of the charge just quoted. The objection to it is that the court, by the language, ''It will be your duty to assess such damages as shall be fair and just,'' gave the jury the license, without restriction, to find any amount within that alleged which they thought was just and fair. We do not think the charge open to that, for the jury were expressly charged that the ''damages must be strictly limited to the financial loss sustained by the widow.'' A mere glance at the charge on the question of damages shows the court, at the defendant's request, fully, if not more than, protected the rights of the defendant in such particular.

The court, among other things, charged the jury that it was the duty of the defendant, and of its servants in charge and in control of the train, to use reasonable care and diligence with respect to its movements in carrying the deceased and others on the train, and that, if the jury found that reasonable care and diligence, under all the circumstances, required that the train be brought to a stop and an inspection made of the bridge before attempting to cross it, and that the servants in charge of the train failed and neglected to do that, and that because of such neglect and failure the engine was precipitated into the ravine and the deceased killed, the defendant would be liable, unless the

jury found from a preponderance of the evidence that he had assumed the risk. The court then further charged:

"The court instructs the jury that, if you believe from the evidence that the bridge crossing the ravine where the accident occurred was weak and insufficient to withstand the force of the waters which would flow down through said ravine under the conditions and circumstances prevailing on the night in question, so that the force of such waters would wash away said bridge or any part thereof, as alleged in the complaint, or if you believe from the evidence that the east bank of said ravine was not protected by cribbing or other bulwark for the purpose of preventing the water flowing in said ravine under such circumstances from undermining and washing away the east bank and the supports to said bridge at the point where it reached the east bank, as alleged in the complaint, and if you believe from the evidence that the defendant knew, or, by the exercise of reasonable care and diligence, ought to have known, that said bridge was so insufficient, and that it was dangerous for the train upon which the deeased was riding to be moved over on the night in question, and that, notwithstanding such fact, the defendant caused or permitted the train upon which the deceased was riding to be moved upon said bridge in an attempt to cross said ravine while such dangerous condition existed, and if you believe from the evidence that the train was wrecked and precipitated into said ravine, and that the deceased was thereby killed, and that his death resulted by reason and on account of such defect or insufficiency of said bridge and its supports, then the defendant would be guilty of negligence, and would be liable to the plaintiff in this action, unless you find from the preponderance of the evidence that the deceased assumed the risk."

Complaint is made of a portion of this charge. What is urged against it is that the court assumed that the bridge was insufficient and dangerous, and that the defendant was negligent in not protecting the east bank with cribbing. The language pointed to from which it is claimed the court assumed that is:

"If you believe from the evidence that the defendant knew, or, by the exercise of reasonable care and diligence, ought to have known, that the said bridge was so insufficient, and that it was dangerous for the train upon which the deceased was riding to be moved over on the night in question," etc.

We think it does not fairly convey 'that meaning. Further, that the bridge was dangerous "on the night in question," at the time it was attempted to be crossed, admits of no controversy, for the evidence, without dispute, shows that the east bank was washed away, the bridge left so unsupported and rendered so insecure as to be almost impossible to operate an ordinary engine and cars over it. We do not see anything in the charge to justify the conclusion that the court assumed that the defendant was negligent because it had not protected the east bank with cribbing.

Thus, upon a review of all the assignments presented, we find no reversible error.

The judgment is therefore affirmed, with costs.

FRICK and McCARTY, JJ., concur.